CHRISTOPHER M. CHESTNUT
(Admitted Pro Hac Vice)
The Chestnut Firm LLC
5080 Newberry Road, Suite 2A
Gainesville, FL 32607
(352) 377-4444 Telephone
(352) 377-2667 Facsimile
Chris.chestnut@chestnutfirm.com

JAMON R. HICKS (CA SBN 232747)
THE COCHRAN FIRM
4929 Wilshire Boulevard, Suite 1010
Los Angeles, CA 90010
(323) 931-6200 Telephone
(323) 931-9521 Facsimile
jhicks@cochranfirm.com

Attorneys for Defendant
Christopher Chaney

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                 Plaintiff,<br><br>                 v.<br><br>CHRISTOPHER CHANEY,<br>    aka "trainreqsuckswhat",<br>    aka "anonygrrl",<br>    aka "jaxjaguars911",<br><br>                 Defendant. | No. CR 11-958(A)-SJO<br><br><u>DEFENDANT'S AMENDED POSITION RE:</u><br><u>SENTENCING OF DEFENDANT</u><br><u>CHRISTOPHER CHANEY; EXHIBIT</u><br><br>**SENT. DATE: December 3, 2012**<br>**SENT. TIME: 9:00 a.m.** |

Defendant CHRISTOPHER CHANEY, through his counsel of record, Christopher Chestnut, Esq., and Jamon R. Hicks, Esq., hereby state as follows:

//

//

//

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . ii

I. INTRODUCTION . . . . . . . . . 1

II. ANALYSIS . . . . . . . . . . 2

    A. INAPPLICABILITY OF SOPHISTICATED MEANS ENHANCEMENT . 3

    B. HISTORY AND CHARACTERISTICS OF DEFENDANT . . . 6

    C. NEED TO AVOID UNWARRANTED SENTENCING DISPARITY . . 7

    D. RESTITUTION . . . . . . . . . 9

    E. DOWNWARD DEPARTURE . . . . . . . 11

III. CONCLUSION . . . . . . . . . 12

TABLE OF AUTHORITIES

FEDERAL STATUTES

18 U.S.C. § 1030(a)(5)(a)   .   .   .   .   .   .   .   2

18 U.S.C. § 3553(a) .   .   .   .   .   .   .   .   .   2

18 U.S.C. § 3553(a)(1)   .   .   .   .   .   .   .   .   6

18 U.S.C. § 3553(a)(6)   .   .   .   .   .   .   .   .   7

18 U.S.C. § 3553(a)(7)   .   .   .   .   .   .   .   .   10

SENTENCING GUIDELINES

U.S.S.G. § 2B1.1(a)(2)   .   .   .   .   .   .   .   .   1

U.S.S.G. § 2B1.1(b)(1)(F)   .   .   .   .   .   .   .   1

U.S.S.G. § 2B1.1(b)(2)   .   .   .   .   .   .   .   .   1

U.S.S.G. § 2B1.1(b)(10)   .   .   .   .   .   .   .   .   1

U.S.S.G. § 2B1.1(b)(10)(A)   .   .   .   .   .   .   .   3

U.S.S.G. § 2B1.1(b)(10)(B)   .   .   .   .   .   .   .   3

U.S.S.G. § 2B1.1(b)(10)(C)   .   .   .   .   .   .   .   3

U.S.S.G. § 2B1.1(b)(10)(C) cmt. n.8(B)   .   .   .   .   .   4

U.S.S.G. § 2B1.1(b)(16)   .   .   .   .   .   .   .   .   1

U.S.S.G. § 2B1.1(b)(17)   .   .   .   .   .   .   .   .   2

U.S.S.G. § 3E1.1   .   .   .   .   .   .   .   .   .   2

CASES

Tate v. Short
     401 U.S. 395 (1971) .   .   .   .   .   .   .   .   9

United States v. Makwana
     445 Fed.Appx. 671 (4th Cir. 2011)   .   .   .   .   .   4

United States v. Barrington
     648 F.3d 1178 (11th Cir. 2011)   .   .   .   .   .   4

//

United States v. Luis Mijangos

    CR 10-743-GHK  .  .  .  .  .  .  .  .  .  7

United States v. Michael David Barrett

    CR 09-1215-R  .  .  .  .  .  .  .  .  .  9

United States v. Christopher Osinger

    CR 10-758-ODW  .  .  .  .  .  .  .  .  .  9

# I.

## INTRODUCTION

On March 26, 2012, Defendant Christopher Chaney ("defendant") pled guilty to nine (9) counts of a first superseding indictment (FSI) containing twenty-eight (28) counts.  On June 11, 2012, the United States Probation Officer assigned to defendant's case disclosed the Presentence Investigation Report.  The report recommends a total offense level of 25 for defendant, resulting in a sentencing range of 57 to 71 months.  Defendant, Christopher Chaney, by and through his counsel of record, Christopher Chestnut, Esq., and Jamon R. Hicks, Esq., respectfully requests the Court adopt a total offense level of 23 for defendant, resulting in a sentencing range of 46 to 71 months.  This calculation removes an offense level increase of +2 for use of sophisticated means (U.S.S.G. § 2B1.1(b)(10)), as stated in the advisory Sentencing Guidelines calculations of the Presentence Investigation Report.

Defendant respectfully requests that the Court adopt the remaining advisory Sentencing Guidelines calculations, as set forth in the Presentence Investigation Report referenced above. Specifically, the defendant requests that the Court adopt a total offense level of 23 (based upon a base offense level of 6 (U.S.S.G. § 2B1.1(a)(2), and increase of +10 based on loss of between $120,000 and $200,000 (U.S.S.G. § 2B1.1(b)(1)(F)), an increase of +4 for more than 50 victims (U.S.S.G. § 2B1.1(b)(2)), an increase of +2 for a conviction under § 1030 involving the intent to obtain personal information and the unauthorized public dissemination of personal information (U.S.S.G. § 2B1.1(b)(16)), an increase of +4 for

1

1   conviction   under   18   U.S.C.   §   1030(a)(5)(A)   (U.S.S.G.   §

2   2B1.1(b)(17)),   and,   as   defendant   continues   to   fully   accept

3   responsibility   for   his   criminal   conduct,   -3   for   acceptance   of

4   responsibility (U.S.S.G. § 3E1.1) as well as a criminal category

5   of I).

6        Based   on   the   factors   set   forth   in   18   U.S.C.   §   3553(a),   the

7   defendant   respectfully   request   a   sentence   at   the   low   end   of   the

8   proposed Guidelines range.   Specifically, the defendant respectfully

9   requests   a   sentence   of   46   months   imprisonment   to   be   followed   by

10  three years of supervised release.

11                                   **II.**

12                                **ANALYSIS**

13       A   low-end   sentence   of   46   months   imprisonment,   based   on   a   Total

14  Offense Level of 23, is a sentence sufficient to meet the sentencing

15  goals   of   18   U.S.C.   §   3553(a)   while   extending   neither   lower   nor

16  greater   than   necessary.   Defendant   acknowledges   that   several

17  factors,   such   as   the   number   of   victims   and   extent   of   the   harm

18  caused, necessities several increases from the base offense level.

19  However, defendant disputes the applicability of any offense level

20  increase pursuant to U.S.S.G. § 2B1.1(b)(10), and therefore asserts

21  that the range of sentence lengths must be calculated from a Total

22  Offense   Level   of   23,   instead   of   the   Total   Offense   Level   of   25

23  suggested by the Presentence Investigation Report and adopted by the

24  government.   Additionally,   in   comparison   to   other   sentences   imposed

25  in   this   jurisdiction   for   comparable   conduct,   the   sentence

26  recommended   by   both   the   Presentence   Investigation   Report   and   the

27

government's Position is excessive, and the alternative sentence suggested by defendant is reasonable.

A. INAPPLICABILITY OF SOPHISTICATED MEANS ENHANCEMENT

The Presentence Investigation Report identifies five offense level categories under which an increase to the base offense level is warranted. Of the five, defendant asserts that one is inapplicable based on the underlying facts and must be removed from the calculation of the total offense level.

U.S.S.G. § 2B1.1(b)(10) provides for an increase

> If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means, increase by 2 levels. If the resulting offense is less than level 12, increase to level 12.

Defendant did not relocate, or participate in relocating, a fraudulent scheme to evade law enforcement or regulatory officials; nor is there any evidence to support such an allegation. Defendant's actions were conducted entirely from Jacksonville, Florida (PIR ¶ 19). Therefore, U.S.S.G. § 2B1.1(b)(10)(A) is not applicable. For the same reason, U.S.S.G. § 2B1.1(b)(10)(B) is not applicable, as a substantial part of a fraudulent scheme was not committed from outside the United States.

To substantiate an increase of 2 levels, the Court must therefore find that U.S.S.G. § 2B1.1(b)(10)(C) applies. This subsection requires a factual finding that the offense otherwise involved "sophisticated means". The government argues that the

commentary at U.S.S.G. § 2B1.1(b)(10)(C)cmt.n.8(B) validates the assertion that this subsection is applicable to defendant's actions. In Comment 8(B), "sophisticated means" is defined as

> Especially complex of especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main offense of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

As previously mentioned, defendant's actions which are at issue were all conducted from a singular jurisdiction – Jacksonville, Florida. Therefore, the type of sophisticated means as described in the example in Comment 8(B) is distinguishable. The remaining portion of Comment 8(B) emphasizes sophisticated means as involving conduct which uses "fictitious entities, corporate shells, or offshore financial accounts". Those mechanisms, common features of tax or bank fraud violations,

The government insists that the sophisticated means enhancement can apply in any computer hacking case. It relies on two cases, United States v. Makwana, 445 Fed.Appx. 671 (4th Cir. 2011)(unpublished opinion) and United States v. Barrington, 648 F.3d 1178 (11th Cir. 2011) in support of this position. However, both cases are easily distinguishable from the instant case. In Makwana, the Court found that the way the defendant "embedded malicious code" and went to "efforts to conceal the presence of the code" was sophisticated. Id. at 673. In Barrington, the defendant and his co-conspirators "installed keyloggers" to retrieve the information needed to carry out their cheating scheme. Id. at 1199.

Defendant's actions, comprised of guessing passwords to email accounts through trial and error based on information already readily available on the internet (PIR ¶ 20), hardly rise to the same level described in the foregoing cases. In both cases, the defendant altered the digital composition of their victim's equipment (via additional malicious code in Makwana and a keylogger in Barrington) to obtain their unauthorized access. In fact, the Barrington Court draws a distinction between the non-sophisticated method of "simply watching employees log in to the system" with the "stealthy means" of installing keyloggers. Id.

In its Response to defendant's original Position re: Sentencing, the government cites to the assertion in the Presentence Investigation Report that defendant utilized sophisticated means because he (1) reset the victims' passwords, (2) changed account settings so that he would receive a copy of the victims' emails, and (3) used proxy servers to hide his identity from law enforcement (PIR ¶ 51).

Neither the use of a "password reset" nor an "account settings" menu qualifies as sophisticated means. Unlike the addition of new code or use of third-party software, as in Makwana and Barrington respectively, defendant merely used the features inherent to the email program and/or provider used by his victims. Even the email address, through which he received the duplicate copies of his victims' incoming emails, would have been discoverable if his victims examined the settings of their email account. In addition to changing their password, the victims could also have changed the account setting so that defendant's email address no longer received forwarded copies of their inbox.

The government's third argument concerns defendant's use of proxy servers. The critical distinction the government fails to acknowledge is that the use of proxy servers was irrelevant to defendant's method of "hacking" by guessing passwords and receiving duplicate incoming emails. Therefore, the Court should not consider those actions in determining the applicability of U.S.S.G. § 2B1.1(b)(10).

B. HISTORY AND CHARACTERISTICS OF DEFENDANT

Defendant reiterates that he has accepted responsibility for his actions, qualifying him for a downward adjustment to the Total Offense Level of 2. Defendant also notes that he has qualified for an additional downward adjustment of 1 by timely notifying authorities of his intention to enter a guilty plea. Defendant urges the Court to consider his expressions of remorse, as well as the character statements of family members and friends (attached hereto as Exhibit A), and impose a sentence at the low-end of the sentencing range.

Furthermore, defendant, by and through his counsel, has retained a medical professional to conduct a psychological evaluation to evaluate defendant's condition. Defendant humbly requests that it be permitted to incorporate the conclusions of said psychologist upon receipt of their report, which defendant anticipates receiving by late October 2012, as it will likely provide further evidence supporting the nature and circumstances of the history and characteristics motivating defendant's actions, pursuant to 18 U.S.C. § 3553(a)(1).

//

//

6

1    C. NEED TO AVOID UNWARRANTED SENTENCING DISPARITY

2         18 U.S.C. § 3553(a)(6) requires the Court to consider "the need

3    to avoid unwarranted sentence disparities among defendants with

4    similar records who have been found guilty of similar conduct" when

5    determining the particular sentence to be imposed.  The government

6    highlights two cases in its argument to the Court that a high-end

7    sentence is necessary to maintain uniformity in sentencing for

8    hacking crimes.

9         Of particular significance is the citation to <u>United States v.</u>

10   <u>Luis Mijangos</u>, CR 10-743-GHK.  The government references this case

11   to support its position that imposing a high end, 71-month sentence

12   (under the Total Offense Level of 25) in defendant's case is

13   necessary to promote uniformity with the 72-month sentence imposed

14   in Mijangos.  While it is true that both the defendant and Mijangos

15   pled guilty to charges under 18 U.S.C. § 1030(a)(2)(C) and 18 U.S.C.

16   2511(1)(a), the facts underlying those charges diverge significantly

17   from one another.

18        First, Mijangos is identified as having "hundreds" of victims.

19   As stated in both the Presentence Investigation Report and the

20   government's Position, the number of defendant's victims is

21   calculated at slightly more than sixty (60) persons.  The number of

22   victims is significantly lower.

23        Second, the method by which Mijangos committed the crimes for

24   which he was charged differs significantly from defendant's.

25   Mijangos infected his victims' computers with malicious software,

26   using those programs to steal both personal and financial

27   information.  Additionally, Mijangos used his access to trigger his

victims' electronic equipment remotely in order to actively procure new photos and videos of his victims, or to spy on his victims in real-time.  He would then use the information he gathered to play psychological games with his victims, as well as extort even more sexual images ("sextortion") from those victims.  The combination of these actions led the Judge who sentenced Mijangos to label him as a "cyber-terrorist".

Defendant's actions, in contrast, are of a significantly lower caliber.  Defendant did not use software, malicious or otherwise, to access the equipment of his victims.  Additionally, defendant did not remotely control the equipment of his victims, such that new visual or audio content would be created without the knowledge of the victims.  In Mijangos, the victims often had no forewarning that their electronic equipment was capturing their voices or images.  In the instant case, defendant merely accessed visual content that the victims chose to create and store.  Furthermore, the factual findings enumerated in the Presentence Investigation Report, and adopted by both parties, document no attempts (successful or otherwise) by defendant to engage in either psychological games or extortion with his victims.  The only notable difference between Mijangos' and defendant's victims is that Mijangos' victims were relatively anonymous teens and young women, whereas defendant's victims were mostly members of the Hollywood elite.  The familiarity and notoriety of defendant's victims among the national and international media should not warrant a more severe and disparate sanction.

//

1    Perhaps most importantly, despite the far-reaching actions and
2    appalling effects described above, the Court chose to impose a
3    sentence which was twelve (12) months - a full year – lower than
4    that which was requested by the government.   Even when accounting
5    for his physical disability, if the extreme nature of Mijangos'
6    "cyber-terroristic" actions did not warrant imposition of the
7    maximum high-end sentence, neither do the defendant's actions in the
8    instant case.

9    As acknowledged by the government, the remaining two cases
10   cited in support of its position that a high-end sentence is
11   necessary to prevent sentencing disparity, United States v. Michael
12   David Barrett, CR 09-1215-R and United States v. Christopher
13   Osinger, CR 10-758-ODW, factually distinguishable from the actions
14   of defendant.   Any attempt to analogize the sentences imposed by the
15   Court in those two cases to the instant case for different charges
16   would necessitate overgeneralization and introduce disparity into
17   the very sentencing disparity that the government asserts must be
18   prevented.

19       D. RESTITUTION
20   The government's position that "[t]he existence of a large
21   restitution amount also militates in favor of a significant sentence
22   in this case" is firmly against public policy.   In Tate v. Short,
23   401 U.S. 395, 398 (1971), the Supreme Court of the United States
24   adopted the position that there was a constitutional defect

25       "in jailing an indigent for failing to make immediate payment
26       of any fine, whether or not the fine is accompanied by a jail
         term and whether or not the jail term of the indigent extends
27       beyond the maximum term that may be imposed on a person willing
         and able to pay a fine.   In each case, the Constitution

prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full."

In stating that a large restitution amount that is not likely to be paid in "any significant amount" by defendant warrants the imposition of a "significant" sentence, the government has implied that the length of defendant's sentence should be determined, at least in part, by the defendant's financial status and means.  As observed the Supreme Court in Tate, above, the Constitution prohibits the State from engaging in that type of analysis, as it invites the inverse analysis that defendant would be deserving of a low-end sentence simply by virtue of having the ability to quickly repay restitution and financial assets available to him.  Therefore, the defendant's ability to repay the restitution imposed should not be considered by the Court as a factor when determining the sentencing length.

Furthermore, 18 U.S.C. § 3553(a)(7) asks the Court to consider "the need to provide restitution to any victims of the offense" when determining the sentence to be imposed; it does not require the Court to impose restitution.  Defendant argues that adding restitution to defendant's sentence is inappropriate for several reasons.  First, assuming the government is correct that defendant is unable to pay "any significant amount" of a monetary penalty, any restitution imposed by the Court would be an empty gesture.

Second, the Presentence Investigation Report fails to reference any documentation of the fees allegedly incurred by the victims. There is no evidentiary support for the alleged restitution in the amounts of $7,500.00 to Christina Aguilera, $66,179.46 to Scarlett

1  Johansson, $76,767.35 to Renee Olstead, $10,374.59 to Aftra Health
2  Fund.  Additionally, there is no documentation of the actions and/or
3  costs that give rise to the foregoing amounts, to which defendant
4  can factually evaluate.  Defendant demands the government provide
5  prima facie evidence as to the proposed restitution amounts prior to
6  the Court imposing said amounts as a component of defendant's
7  sentence.

8       Third, the government has failed to establish a valid causal
9  relationship between the defendant's actions and the amounts of
10 restitution that defendant is allegedly responsible for.  For
11 example, the Presentence Investigation Report alleges that Christina
12 Aguilera and Scarlett Johansson spent $7,500.00 and $66,179.46,
13 respectively, "in legal fees attempting to have their pictures
14 removed from the Internet".  Their actions were not directly caused
15 by the defendant's actions; the intervening actions of other
16 individuals posting the pictures and/or information obtained by
17 defendant caused those victims to incur legal fees.  Furthermore,
18 defendant is unable to determine if the victims' actions were
19 necessary and reasonable without further investigation into the
20 factual basis for those dollar amounts.  Defendant demands the
21 government establish the causal link between the proposed
22 restitution amounts and defendant's actions prior to the Court
23 imposing said amounts as a component of defendant's sentence.

24      E. DOWNWARD DEPARTURE

25      In light of the pending report on defendant's psychological
26 examination, defendant's acceptance of responsibility, and
27 defendant's family and community ties, defendant respectfully

1   requests an additional downward departure from the duration of the
2   sentence recommended by the advisory Sentencing Guidelines of six
3   months to twenty-four months.

### III.

### CONCLUSION

For all of the foregoing reasons, the defendant respectfully requests that the Court sentence defendant to a low-end sentence of forty-six (46) months imprisonment, with consideration of an additional six (6) to twenty-four (24) month downward deviation from the amount calculated pursuant to the advisory Sentencing Guidelines. In the alternative, should the total offense level recommended in Presentence Investigation Report be adopted by the Court, defendant respectfully request that the Court sentence defendant to a low-end sentence of fifty-seven (57) months imprisonment, also with consideration of an additional six (6) to twenty-four (24) month downward deviation.

Respectfully submitted,

Date: September 17, 2012        _____
                                CHRISTOPHER CHESTNUT, ESQ.
                                JAMON HICKS, ESQ.

                                Counsel for Defendant
                                CHRISTOPHER CHANEY

# Exhibit

# A

## Samantha Wright

From:            Alicia Amber [nogutsnoglory904@yahoo.com]
Sent:            Thursday, July 12, 2012 9:40 PM
To:              Samantha Wright
Subject:         Christopher Chaney

Dear Sir or Madame,

Hello. I am writing this letter in reference to Christopher Chaney, who is appearing before you. This letter is in reference to Christopher Chaney's character. I feel strongly about Christopher character and his future. Christopher is a man of good standing morals. I understand this may be hard to believe given the circumstances, but it is true nonetheless.

I have known Christopher for a number of years and have seen Christopher through his up's and down's. Through it all Christopher has been a good reliable and trustworthy person at the core, I personally trust Christopher with anything. I know that Christopher is incredibly remorseful and understands and regrets the choices he has made.

I know Chris will come out and make more positive choices and will have people surrounding him and supporting him through-out all of this. I know Chris is willing to do whatever it take to repair the damage and pay his dues and is willing to accept the fair punishment. I believe in second chances and if anyone is deserving of one it would be Christopher Chaney. Him being gone is a huge personally loss for not all myself but his family. Chris is one of the most giving people I know and one i can trust and depend on for anything.

Please take into the consideration all of the people that love him and need him. Without him there is a large hole in not only my life but countless others. I know he feels the same as me the he should not go without punishment, I just hope you take into serious consideration the future of his life and those if all he touches and helps everyday and make a fair decision.

Thank you,
Alicia Amber

1

**Samantha Wright**

| | |
|---|---|
| From: | stacey b [pokketlint@hotmail.com] |
| Sent: | Friday, July 13, 2012 1:02 AM |
| To: | Samantha Wright |
| Subject: | Christopher Chaney character letter |
| Attachments: | Christopher Chaney letter.wps |

Enclosed is a file containing my character reference letter for Christopher Chaney. I will also enclose the text of this letter at the end of this email in case of formatting errors. Thank you for your time.

12th July 2012

To the Honorable Judge Otero,

Your Honor, I am writing this letter on behalf of Christopher Chaney. I have known Mr. Chaney for 6 years and we share a very close friendship. During this time I have found Chris to be a kind and trustworthy person and I have shared a great deal of my life with him. I can confirm that he is a man of integrity and good moral character though it may seem hard to believe given the circumstances. He is extremely dedicated to his family and is a very peaceful and humble man.

One of the things that endears Mr. Chaney to me is his care and concern for an elderly friend of the family, whom he refers to as "Miss Betsy". Over the years Chris has taken her to various medical appointments and procedures, made repairs to her home, helped her move, taken her to run errands and provided her with much needed companionship. After the death of his grandmother, whom he lived with and cared for, Miss Betsy assumed an even more important role in his life. Perhaps she became a sort of surrogate grandmother, as her loss was a crushing blow for Chris. He has expressed great concern for her well-being while being held on remand. Chris is also very concerned about the welfare of his stepfather who is in ill-health, and the toll it is taking on his mother, being the primary caretaker.

I understand the charges and penalties facing Mr. Chaney, and justifiably so, but I beg the court to show some leniency in sentencing. Chris has expressed such remorse and regret for his actions, and is quite embarrassed at the shame of putting his family in the public eye. He has stated he is willing to do whatever it takes, from serving time and paying restitution to receiving counseling and probation. He now knows he has a large support network willing to help him get his life back on track. It must be difficult to make decisions like this so I hope you will look at my letter and the others you may receive, and understand that Mr. Chaney is the kind of person around whom people rally. That has to say something, so please let that be a factor in your decision. Please consider a lesser sentence for him. I thank you for your time.

Respectfully,

Stacey Bonczek

320 Devon Drive
Chestertown, MD 21620
(443) 480-0644

1

**Samantha Wright**

| | |
|---|---|
| From: | Gail Beckett [gailanddanny@att.net] |
| Sent: | Thursday, July 12, 2012 9:05 PM |
| To: | Samantha Wright |
| Subject: | Chris Chaney |

# To Whom It May Concern:

I am writing this letter to let you know that in my opinion Christopher Chaney is a great person who has a very kind personality and heart....I have been friends of the Chaney family for many years. I worked with Cathy Chaney (his mother) for over 25 years at AT&T.....I have always enjoyed hearing about or participating in family birthdays, reunions, dinners, holidays etc. In regards to Christopher Chaney, I have never met a kinder human being....He has always shown such respectfulness towards me over the years.....I have always known him to be extremely loving and devoted to his family. The Christopher Chaney I know, would never intentionally hurt anyone or for that matter any animal..Chris has always been very kind and forthright...From my perspective, and for all the many years of knowing Christopher, he has always been helpful, honest, and displayed a loving demeanor towards his family and friends. I personally have never witnessed any harmful acts from Christopher or heard him speak derogatory about anyone. I think he is a fine upstanding person and I trust him 100 %.

If you need any further information, please feel free to contact me, via my email.

Mrs. Gail Beckett

1

**Samantha Wright**

| | |
|---|---|
| **From:** | Amanda Chaney [achaneyx@gmail.com] |
| **Sent:** | Thursday, July 12, 2012 11:06 AM |
| **To:** | Samantha Wright |
| **Subject:** | Chris Chaney |

Dear Sir or Madam,

Hello. I am writing in reference to Chris Chaney, who is appearing before your court.

I feel strongly about Chris, and about his future, and I want to try to make you feel the same way.

Chris is a person of good moral character. I have known Chris my entire life, 29 years, and in that time I have seen him go through ups and downs, but all the while I have been convinced that he is a decent person at the core.  I say without a doubt that you are dealing with a person of very good moral character. Chris operates with integrity, and never has a bad word to say about anyone. He is also hard working and dedicated, and never leaves a job unfinished.

Chris has made mistakes, and he is incredibly remorseful. He needs you to give him an opportunity to get a second chance.  I hope you will recognize the power you wield with regard to the future of this man and make a fair decision.

Thank you,

Amanda Chaney

1644 N Bumby Ave

Orlando, FL 32803

407-595-2046

1

## Samantha Wright

From:         Jlady1234 [jlady1234@aol.com]
Sent:         Thursday, July 12, 2012 11:17 AM
To:           Samantha Wright
Subject:      Christopher Chaney

To Whom It may concern.
 I have known Chris Chaney for a few years. I have always known Chris to be a fine young man. He is very good to his family and friends. Always there when someone needs him. He is very polite well mannered and caring. I believe Chris is a very good person. Before this he has never been in any trouble. he also helps with the elderly.

Sincerely

Jane Davis

**Samantha Wright**

| | |
|---|---|
| From: | Rob Ashley [roba12345@gmail.com] |
| Sent: | Thursday, July 12, 2012 11:34 AM |
| To: | Samantha Wright |
| Subject: | Christopher Chaney |

To whom it may concern,

I have known Chris Chaney since high school, nearly 20 years now.  He was one of, if not my best friend during my teenage and young adult years. Although I have moved out of Florida, we continue to keep in contact and are still good friends today, which is why I believe I'm a good source to speak about his character.

I was completely shocked when I found out about this case. I believe the charges that he has plead guilty to are absolutely out of character for Chris. All of the years that I have known him, he has been considerate, kind and caring of others. He is a very sincere person who has a good heart. I do not know what was going through his mind at the time, but I do know that he regrets what he did and not for selfish reasons. So I beg that you have mercy on my kind sincere friend when serving justice.

I appreciate your time to read my comments.

sincerely,
Robert Ashley
703-481-2078

1

**Samantha Wright**

| | |
|---|---|
| From: | sixfivejc@aol.com |
| Sent: | Thursday, July 12, 2012 11:39 AM |
| To: | Samantha Wright |
| Subject: | Christopher Chaney Reference |

My name is Johnathan Chaney and I am the younger brother to Christopher Chaney. He was more than an older brother growing up. He was a great friend. He got me into different hobbies to help expand my mind. Without him I wouldn't be who I am today. He pushed me into learning everything I possibly could. We are a simple family that is very close and we help one another out. We don't take advantage of people. We all do dumb things and we regret doing them. We don't want to harm anyone. My brother is a good man who did a dumb thing and he doesn't deserve the attention it has gotten. I love him and he deserves to be free with his family.

1

**Samantha Wright**

| | |
|---|---|
| **From:** | cordelle77@aol.com |
| **Sent:** | Thursday, July 12, 2012 1:20 PM |
| **To:** | Samantha Wright |
| **Subject:** | In regards to Christopher Chaney. Character reference. |

Greetings.

I'd like to say a few things about my one and only full brother, Christopher. I'm assuming this wont be made public so I'm going to be candid. I'm not going for the sympathy vote here, I'm just being honest. We are less than a year apart in age, so naturally, we were extremely close. We didn't exactly have the greatest childhood. Raised by my mother on a low income, we only had each other. My mother did the best she could until she remarried. Thats when things got worse. Our stepfather was abusive. Chris had trouble dealing with all of this, but maintained positivity. If it were not for his example, I'd surely be dead today. So many times I contemplated suicide at a young age. It's like he knew I needed his example. I'll never forget those times. He was sent to a bible work camp recommended by the church pastor after stealing a comic book. He was there over a year. No TV. Barracks with alarms on the doors. In with actual offenders. He maintained. That year without him tested me, yet he maintained. He's one of the strongest, smartest people I've ever known. He's always been there any time he was needed. He's been a regular friend and help to an elderly friend of the family. Her name is Betsy. Takes her to her appointments, shopping, moves her furniture, etc. He's non violent. Wouldn't hurt anyone. I don't remember the last time I saw him angry. All of this is crazy to me. He may have a problem, but doesn't deserve a jail sentence. I'm not condoning his actions, but he did not profit or physically threaten anyone. Chris has lived a hard life that has put him in this situation, but making his life harder will not fix anything. He doesn't deserve it. He is a kindhearted and caring person. Not to be dramatic, but I know he would take a bullet for me or even a stranger, and I would do the same for him. Again, I wouldn't be here if it weren't for Christopher.

Thank you for your time.
Craig Alan Chaney

**Samantha Wright**

| | |
|---|---|
| From: | Abigail Chaney [abigailchaney@ymail.com] |
| Sent: | Thursday, July 12, 2012 2:46 PM |
| To: | Samantha Wright |
| Subject: | Christopher Chaney |

To Whom it May Concern:

I have had the pleasure of knowing Christopher H. Chaney my whole life. I was born as his half-sister but we have never considered each other half-siblings. Our bond is so much deeper than that. Christopher moved in with our grandmother almost right out of high school and became her caretaker. I was about 5 years old at the time. Growing up, I remember how excited I would be to go to Grandma's house and see my brother. This is also around the time my Dad was diagnosed with a brain aneurysm. Christopher did everything he could to help our Mom with doctors and E.R. visits, as well as helped out with the younger children in the family. Thirteen years later, when I was 18 years old, I moved to Grandma's too. He welcomed me with open arms and even gave up some of his furniture so I could have some. We talked about movies, music and the meaning of life. We became best friends. He spent about 15 years caring for our grandmother, taking her to doctor's appointments, grocery shopping, helping around the house and being her company. I believe she lived a longer, happier life because he was with her. I know my life was happier with him in it. Our family is very tight-knit and without Christopher, nothing is the same. Christopher is the type of person who can make a whole room come to life with a single joke, a person who will hold the door for a stranger, who will do anything that is asked of him and is always trying to please. I've always known him to be a thoughtful, caring, ever-giving person. Christopher deserves a chance to show the world he truly is a gentleman and not the person he is being made out to be.

Thank You,
Abigail B. Chaney

1

**Samantha Wright**

| | |
|---|---|
| From: | Stacey Ely [srcbe12@gmail.com] |
| Sent: | Thursday, July 12, 2012 3:07 PM |
| To: | Samantha Wright |
| Subject: | Christopher Chaney |

To whom it may concern,

I would like to express my thoughts and opinions on Chris. Christopher Chaney is the smartest, most caring, compassionate man that I know. Chris would never intentionally harm anyone or cause anyone pain. If you needed a shirt, Chris would give you the one off his own back. He has worked hard in his life only to be let down around every turn. He goes out of his way to help others, even when it means doing harm to himself to do so. So many people have taken advantage of him because he is too nice! I cannot express enough what an all around good person Chris really is.

Sincerely,

Stacey Ely

1

**Samantha Wright**

| | |
|---|---|
| From: | Jennifer Blair [jenmb616@yahoo.com] |
| Sent: | Thursday, July 12, 2012 5:53 PM |
| To: | Samantha Wright |
| Subject: | Christopher Chaney |

To whom it may concern,

I have known Christopher my entire life. He is the one person i have always known will be there for me no matter what. He is one of the most selfless people i have ever known. I don't believe he would ever intentionally hurt anyone. He is kind, and shy and would never do anything that would put his family or friends at risk. He's has been not just my cousin, but my brother and my friend. I would trust him with my life and the life of my family. He has been there for a many a crisis in my life and i will stand by him forever.

Sincerely,
Jennifer Marie Blair

1

**Samantha Wright**

| | |
|---|---|
| From: | VERN Durham [madurham72@hotmail.com] |
| Sent: | Thursday, July 12, 2012 7:54 PM |
| To: | Samantha Wright |
| Subject: | Re: Christopher Chaney |

Re: Christopher Chaney

My name is Veronica Durham, I am 40 years old, and I am "The Pastors Wife". As much as I hate hearing that phrase, that is my occupation right now.

I support my husband ministry to reach a lost and dying world. I am writing this letter on behalf of Christopher Chaney, my step brother. We all love and adore Chris. We would all like to see Chris out of prison and joining us as a family. I have known Chris since he was around twelve years old. We lived together & still interact as siblings.

In talking with him, he looks back now and sees where he went wrong and why it happened, and wishes he had not been a part of it at all. Although I have never been bitten by the judicial system, I can recall times when I was younger, when I had done something "just for fun" and had many opportunities for those activities to backfire on me. I honestly think that this is just one of those things that Chris got caught up in. Knowing Chris and thinking of him as family, & after talking with him, I have noticed a change in his demeanor. I think it is a change for the good. At the same time that I am sure his incarceration was a bad thing for him; I've searched my heart & feel this incarceration has also been a good thing for him as well; you could call it an eye opener.

Jail is designed to punish & reform, as well as keep the public safe. I believe that all three of these goals have been met. I believe that releasing Christopher would be worth taking a chance on. He has the support of his family & also his friends. I am not just writing this letter just for Christopher or myself, but also his mother Cathy Chaney. This ordeal has been a great strain on her as well. She has reared four children, as well as myself for several years & also been an immense help and example for my own son. I know she would love to be able to see & talk to her son on a daily basis, and wrap her arms around him and keep him close and let him know he is loved.

I wouldn't be asking this if I didn't really see and believe how much he has changed for the better. I discern that Chris will be a very productive member of his family and society. We all know that one of the first parts of making a better person out of oneself, is wanting to do it! I know Chris, and I believe this was changing point in his world. I honestly do not believe he set out to break the law, therefore, being punished for it, he has learned his lesson, and will not be a repeat offender.

Thank you for taking the time to read over my request. If you would like to contact me for anything, my phone number is 904-613-7975.

Sincerely,
Mrs. Veronica L. Durham

1

Sheri Walsh                                           March 26, 2012

5708 Hillman Dr.

Jacksonville, Florida 32244


   I am writing this letter on behalf of Christopher Chaney.

I have known Christopher or Chris as we all affectionately call him, for his whole life.

He was such a sweet kid with a big heart and as he grew so did his heart. Chris has always been there for me when I needed help with anything. If I was out yard selling and found something big I would call him for help in moving it and he would come. He never said no, he was never too busy. He came and helped and never asked for anything in return. There was one time I was at work and my daughter called me to tell me a snake was in our house. I know Chris was home so I called him and he went right over. When I got home I called him to find out where he disposed of the snake and he told me he did not kill it he just trapped it then turned it loose in a safer environment for the snake.

Chris is the type of person that if you were stranded on the side of the road and all the other cars full of people would be driving by you he would be the one to stop and help.

Chris is a good person. He is loved by everyone he meets. He does not have a mean bone in his body.

I am very proud to know him,

Sheri Walsh